UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED
CLERKS OFFICE
2005 MAR -8 P 12: 03
U.S. DISTRICT COURT

John J. Connolly, Jr.
    Petitioner,

- v -

United States of America
    Respondants

Civ. No. 04-12396 JLT
[Crim. No. 99-10428-JLT]

PETITIONER'S MOTION FOR LEAVE TO AMEND HIS ORIGINAL
28 USC § 2255 PURSUANT TO FED. R. CIV. P. RULE 15(a)

Comes now, John J. Connolly, Jr., (herinafter "Petitioner") appearing pro se, and hereby moves this Honorable Court, as referenced above, for leave to amend his original 28 USC § 2255 application with a new ground in conformity with the one-year time limitations depicted in both 28 USC § 2255(3) & (4) and the Federal Rules of Civil Procedure's Rule 15(a). As necessitated to obtain leave for such action, the Petitioner proceeds and presents the following, to wit.

I. RELEVANT HISTORICAL BACKGROUND.

The pertinent historical background to be reviewed in this matter was laid out in Petitioner's motion requesting appointment of Counsel and therefore will not be reiterated here. Thus, Petitioner incorporates said summary of background by reference persuant to Federal Rules of Civil Procedure, Rule 10(c).

II. THE GOVERNMENT IMPROPERLY USED OUT-OF-COURT STATEMENTS AGAINST THE PETITIONER IN VIOLATION OF THE CONFRONTATION CLAUSE OF THE UNITED STATES CONSTITUTION

Over the Petitioner's assiduous objections, the trial court allowed the Government to introduce a myriad of out-of-court statements via the government's witnesses. This was done without placing the persons whom allegedly made the statements on the

witness stand to be cross-examined by the defense.

The District Court (in good faith), relying on it's interpretation of <u>Bruton V United States</u>, 391 U.S. 123, 126-28 (1968), allowed material inculpating statements into the trial on the grounds of the reliability of the testimonial statements. However, the Supreme Court has now explicitly clarified it's precedents in this area of constitutional jurisprudence. In <u>Crawford v Washington</u>, 541 U.S. 36 (2004), the Crawford Supreme Court held that "where testimonial statements are at issue, the only indicum of reliability sufficient to satisfy Constitutional demands is the one the Constitution actually prescribes: confrontation." <u>Id</u>. Thus, the ruling on the admissibility of the unsworn out-of-court hearsay statements was incorrectly decided and, hence, violated the Petitioner's Sixth Amendment right to be confronted with the witnesses against him.

There were several witnesses' statements that were used in the Petitioner's trial against him (without Petitioner having the opportunity to cross-examine them), but years later, by happenstance, the Petitioner found evidence that proves the government's witnesses were lying on the witness stand. This is precisely why the Supreme Court determined that "where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions or "reliability." <u>Id</u>.

(A) <u>Brief examples of Hearsay Testimony</u>:

The following are specific examples of con-conspirator hearsay testimony allowed as evidence at trial which violated the "Confrontation Clause" of Petitioner's Sixth Amendment guarantees. These examples are merely representative of the myriad of hearsay testimony

3

allowed into evidence against Petitioner and are not meant to represent all of the hearsay statements allowed in violation of the Confrontation Clause of the Sixth Amendment of the United States Constitution in instant matter.

At the outset of the testimony of Government witness, John Martorano, counsel for Petitioner asked the Court for a "continuing objection" to the hearsay testimony of Mr. Martorano. The Court granted the "continuing objection:"

> MS. MINER: Can I have a continuing objection, your Honor?
> THE COURT: You may have a continuing objection. (See Trial Transcript, May 13, 2002; Page 49 at 20)

Petitioner's counsel reiterated the request for a continuing objection further into Mr. Martorano's testimony:

> MS. MINER: Objection
> THE COURT: What is the objection?
> MS. MINER: If I can have a continuing objection to all of these co-conspirator statements, I'll take it' but otherwise I have to keep objecting.
> THE COURT: All right. So why don't we give you a continuing objection. Listen carefully in case the question goes off track. But the record will make clear that I recognize you have a continuing objection to the co-conspirator statements.
> MS. MINER: Thank you.
> THE COURT: Do you have any objection to that ruling?
> MR. DURHAM: No, your Honor.
> THE COURT: All right, let's go. (See Trial Transcript May 13, 2002; Pg. 59 at 11)

The following are examples of hearsay testimony by Government witness, Frank Salemme, which violated Petitioner's Confrontation Clause guarantees under the Sixth Amendment:

> Q And did you, to your personal knowledge, sir, ever have any conversations with Stephen Flemmi about actually paying any law enforcement authorities?
> A I did.
> Q And did you have one, or more than one conversation about that?
> A More than one.
> Q Do you know who monies were being paid to?
> A I know who he said they were being paid to.

> Q  All right. Who did Stephen Flemmi tell you he was paying money to?
> A  John Connolly and a State Police officer who worked in the Attorney General's office who was familiar with wiretaps or wiretap--the enacting of wiretaps. (See Trial transcript May 17, 2002; Page 55 at 11
>
> Q  What kind of additional information did you receive?
> A  We were receiving information such as the grand jury was looking at the car bombing with me back in the '60s, the murders of teh '60s on me. And that he (Flemmi) said that John Connolly provided him with this information for me. (See Trial transcript, May 17, 2002; Page 60 at 22)
>
> Q  Explain to the jury what happened then.
> A  He (Flemmi) proceeded to tell me that the indictments were coming down January 10, that he had received word from John Connolly, and that he was -- Jimmy had already left, meaning Jimmy Bulger, and that he (Flemmi) was leaving over the weekend. January 10, was a Tuesday, I believe. And his advice to me was to get out of town until we can see how much damage this thing has done. He made arrangements to meet me in New York again in three months from that date that we were leaving.
> Q  And again, with respect to the information as to when the indictment was going to be returned, who did he say the information had come from?
> A  John Connolly.

The following are examples of co-conspirator hearsay testimony of Government witness, John Martorano, which testimony was allowed in violation of the Confrontation Clause:

> Q  In that regard who was it, if anybody, that approached you about giving Mr. Connolly something?
> A  Whitey Bulger
> Q  What was it that Whitey Bulger said?
> A  Mr. Connolly was looking for a present for his wife for, I think it was the anniversary or something like that. And he's able to help him with it. (See Trial transcript May 13, 2002; Page 42 at 16)
>
> Q  Describe, if you would, to the jury who was part of that discussion about giving something to Mr. Connolly?
> A  It would have been Whitey Bulger, Howie Winter, myself. (See Trial transcript, May 13, 2002; Page 43 at 4)
>
> Q  Explain to the jury, if you would, sir, what you recall about Whitey Bulger providing information to you about Ritchie Castucci and Joe McDonald's fugitive status?

A Whitey Bulger come in one morning and says get in touch
  with Joe, he's got to move right away, his friend is
  "Zip," which was John Connolly, told him (Bulger) that
  Richie Castucci had notified the FBI where he was.
Q As a result of your having gotten that information from
  Mr. Bulger, did you contact Joe McDonald?
A Yes.  (See Trial transcript, May 13, 2002; Page 48 at 17)


Q Did you have any conversations with the other members of
  the Winter Hill Group who were still around -- and this
  is in December of 1976 -- about Mr. Castucci and what
  should be done?
A Yes
Q Who did you talk to about that?
A Howie Winter, Whitey Bulger, Stevie Flemmi.
Q Describe, if you would, what that conversation was and
  what, if any, decision was made as to Mr. Castucci.
- MS. MINER: Can I have a continuing objection your Honor?
- THE COURT: You may have a continuing objection. You may
  answer.
- THE WITNESS: Pardon?
- THE COURT: You may answer.
A Ultimately to solve the problem we were going to take Richie
  out. (See Trial transcript, May 13, 2002; Page 49 at
  11 through Page 50 at 1)


Q To your knowledge, sir, did Mr. Bulger then meet with John
  Connolly?
A Yes, he did.
Q And how do you know that?  That is, what is the basis of
  your knowledge that Bulger and Connolly met?
A Whitey said he met with him.
Q Did Mr. Bulger then explain to you and others what, if
  anything, was said at the meeting between himself, Mr.
  Bulger and Mr. Connolly?
A That Mr. Connolly would keep his ear to the grindstone
  and if he heard anything, relate it to us, he would
  let him know.
Q Did Mr. Bulger explain to you why it was that Connolly
  was approaching Whitey Bulger to talk to Whitey Bulger?
A Yes
MS. MINER: Objection
THE COURT: Overruled  (See Trial transcript, May 13, 2002;
  Page 40 at 4)


Q Describe to the jurors, if you would, who, if anybody,
  you had a conversation with regarding the pinball
  machines.
- MS. MINER: Objects (and is allowed to approach) (See Trial
  transcript, May 13, 2002; Page 52 at 14)
A Whitey Bulger came over and mentioned something about pinballs
  machines, that the guy was running the Veteran's (ph.)
  I think in Somerville, went to the FBI and warned him
  that he had been told that Howie was trying to move
  his way in to put his machines in there. And the guy

> was scared.
> Q And did Mr. Bulger tell you how he obtained that information?
> A Yes, from John Connolly. (See Trial transcript, May 13, 2002; Page 53 at 13)
>
> Q And you had indicated I believe that Bulger and Flemmi also told you that Halloran had provided this information specifically to the FBI; correct?
> A Correct
> Q Did either Mr. Bulger or Mr. Flemmi tell you how they knew that Halloran had provided this information to the FBI?
> A Yes
> Q What did they tell you in this regard?
> A At this meeting Bulger was doing most of the talking and Steve was just agreeing with him. And he told me that his friend "Zip" informed him that Halloran went up and made a statement to the FBI. (See Trial transcript, May 13, 2002; Page 82 at 19 through Page 83 at 5)
>
> A They were trying to convince me that their friend John said that we're all going to go to jail for the rest of our life if something doesn't happen to John Callahan because the FBI is going to put so much pressure on him he's just going to fold, there is no way he's going to hold up.
> THE COURT: What John?
> THE WITNESS: John Callahan won't hold up, John Connolly told him that. (See Trial transcript, May 13, 2002; Page 83 at 19 through Page 84 at 1)
>
> Q Describe to the jurors, if you would, sir, what information Stephen Flemmi gave you about your having been spotted in Florida?
> A He said his friend "Zip" said that I was spotted..."Zip" is the code name for John Connolly. (See Trial transcript, May 13, 2002; Page 92 at 13)

Mr. Martorano, in violation of the Confrontation Clause of the Sixth Amendment was allowed to testify about hearsay conversations he supposedly had with third parties -- despite admitting that he never even met Petitioner:

> Q Now, Mr. Bulger or Mr. Flemmi never introduced you to Mr. Connolly, did they?
> A Never
> Q Never met the man, have you?
> A Never
> Q Never spoken to him?
> A Never
> Q Never asked him to do anything for you?

```
A Never
Q All of your information, it's fair to say, about Mr.
    Connolly came through either Mr. Bulger or Mr. Flemmi?
A That's the reason they were supposed to be seeing him,
    to get information, not give information.
Q And you learned that they were giving information, did
    you not?
A Years and years later.
Q Years later    (See Trial transcript, May 14, 2002; Page
    9 at 7)


Q And during that discovery process, you saw that there were
    a number of reports filed by Mr. Connolly detailing
    information that Mr. Flemmi and Mr. Bulger had provided
    to the federal government; isn't that right?
A Yes
Q And you learned that Mr. Flemmi and Mr. Bulger had been
    informing the federal government about you, did you
    not?
A About friends of theirs, not just the Mafia.
Q Exactly, and you were one of those friends, were you not?
A He informed on everybody he could.
Q Including you, right?
A Including me.
Q Including where you were when you were a fugitive; you
    learned about that, didn't you?
A Yeah, they said where I was when I was a fugitive.
Q And when you learned that, you were furious, were you not?
A Disgusted, furious, upset.
Q You told another inmate that you wanted to kill Mr. Flemmi?
A Sure   (See Trial transcript, May 14, 2002; Page 17 at 16
    through Page 18 at 12)
```

The following are examples of testimony by Kevin Weeks which violated Petitioner's Confrontation Clause guarantee under the Sixth Amendment:

```
Q During this conversation with Mr. Bulger about the Wheeler
    and Callahan matters, did you come to learn how it was
    that Bulger had learned of Halloran's cooperation?
A Yes
Q What did he say?
A He had told me that he learned it from the FBI. In particular
    he said he learned it from "Zip." (Trial transcript,
    May 14, 2002; Page 14 at 6)


Q After you acquired the package store, the South Boston
    Liquor Mart, did you have a conversation with Mr.
    Bulger concerning Joseph Lundbohm going to the FBI?
A Yes
Q What do you recall about that sir?
```

> A He stated that, well, first it was the uncle was stirring up all kinds of trouble, that he had gone to the FBI saying that his niece and her husband were extorted out of the liquor store. He told me that, he said thank God I went to John Connolly, he went to "Zip" he said. (Trial transcript, May 14, 2002; Page 25 at 23 through Page 26 at 7)
>
> A Jim Bulger was told by John Connolly that one of two people that were on the VALHALLA were cooperating with the government on the guns to Ireland. (Trial transcript, May 15, 2002; Page 113 at 18)
>
> Q Why was it that Bulger wanted to kill McIntyre?
> A Because he was an FBI informant.
> Q How did Bulger know that?
> A From the FBI
> Q Do you know from whom?
> A From John Connolly  (See Trial transcript, May 16, Page 65 at 18)

While the above cited conversations are examples of hearsay testimony that were allowed in as testimonial evidence in Petitioner's case, Petitioner was either never charged, or the majority of the charges brought against the Petitioner in the form of Predicate Acts under the RICO Enterprise -- were rejected by the jury and deemed not proven beyond a reasobable doubt. The same cannot be said, however, in the instance of Mr. Salemme's testimony where Petitioner was charged with the Predicate act of tipping off the 1995 Salemme indictment, which charge was proven beyond a reasobable doubt.

These out-of-court testimonial statements unequivocally illustrate that the Government violated the Petitioner's rights under the Sixth Amendment to confront his accuser. See <u>Crawford</u>, <u>Supra</u>.

Viewed through the substantive constitutional holding in Crawford, the Petitioner's conviction must be vacated, and he must be granted a new trial, because none of the hearsay statements were confirmed (by the persons alleged to have uttered them) through

cross-examination by the defense.

Clearly the use of said statements (over Petitioner's objections), violated the bright line constitutional interpretation announced in <u>Crawford v Washington</u>. This constitutional error caused one who was, and is, actually innocent to be convicted of a crime he did not commit.

### III <u>CONCLUSION</u>

In sum, the Supreme Court decided Crawford on March 8, 2004, and the Petitioner has one-year under § 2255(3) and subsection (4) to amend this claim on his original application to vacate his conviction. Thus, in the interest of justice, the Petitioner prays this Honorable Court grants him leave to amend this ground and thereafter vacate his unconstitutional conviction and grant him a new trial and grant any other relief it finds mete and proper. Petitioner will file §2255 memorandum of law prior to the April 29th, 2005 deadline as directed by the Honorable Court.

CERTIFICATE OF SERVICE

I, John J. Connolly Jr., certify that I mailed one true copy of the foregoing motion for leave to amend his original 28 USC § 2255 pursuant to Federal Rules of Civil Procedure, Rule 15(a), to the United States Attorney for the District of Massachusetts, by placing it in an envelope with first-class postage pre-paid affixed thereto, and addressing to the below address.

Michael J. Sullivan
United States Attorney
Office of the United States Attorney
District of Massachusetts
John J. Moakley US Courthouse
One Courthouse Way
South Boston, Mass.  02210

Respectfully submitted,

John J. Connolly, Jr.
Reg# 22928-038
LSCI
Vance - A
P.O. Box 999
Butner, NC 27509